In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-11-00589-CV
_____

DESIGN TECH HOMES, LTD. AND
DESIGN TECH HOMES OF TEXAS, LLC, Appellants

V.

MARY MAYWALD AND RANDY MAYWALD, Appellees

On Appeal from 359th District Court
Montgomery County, Texas
Trial Cause No. 09-09-08476-CV

MEMORANDUM OPINION

Mary and Randy Maywald contracted with Design Tech Homes, L.P. and Design Tech Homes of Texas, LLC (collectively referred to as DTH) to build a house. The Maywalds sued DTH because the house had foundation problems. DTH appeals the trial court's judgment awarding the Maywalds actual damages, prejudgment interest, additional DTPA damages, and attorney fees.

1

THE FIRST AND SECOND CONSTRUCTION AGREEMENTS

The Maywalds entered into an initial Construction Agreement with DTH on January 13, 2000. The agreement was revised and the Maywalds and a DTH representative signed the second Construction Agreement on February 24, 2000. In the agreement, the Maywalds agreed to pay $109,696 to DTH for the construction of a residence. The agreement included a reference to an "ACES Builder Limited Warranty," and disclaimed and waived other warranties.

The ACES limited warranty was purchased by DTH for the Maywalds, and the cost of the warranty was included in the contracted cost of the house. The Maywalds were given the ACES "Builder Limited Warranty and Performance Standards" which explains that the builder is the warrantor and ACES is the warranty administrator. The ACES warranty states that "[s]ubject to the provisions of this Limited Warranty, builder will repair or replace a Major Structural Failure occurring during the ten year warranty period." The ACES warranty states that the determination of whether a foundation failure has occurred is based on calculations pursuant to the "Foundation Stability Guide," and the warranty provides the process for a foundation failure claim by a homeowner.

## THE THIRD CONSTRUCTION CONTRACT

On March 14, 2000, the Maywalds and DTH signed a third contract: the "Residential Construction Contract (with Transfer of Lien to Lender)." The Residential Construction Contract states, "Contractor agrees to furnish and pay for all work and materials . . . needed to construct the Improvements not later than the Completion Date in a good and workmanlike manner according to the Plans and Specifications."

The contract provided further that "[t]his Contract constitutes the final expression of the parties with respect to the matters in it, all other discussions, agreements and contracts being replaced hereby and merged herein." The contract incorporated by reference any "work agreement or construction contract" executed by the contractor and homeowner, but stated that "[s]uch incorporation is not intended to and shall not amend, supersede or qualify in any way the terms and conditions of this Contract and to the extent they contain conflicting provisions, the provisions of this Contract shall control."

## THE EVIDENCE

In 2001, the Maywalds began noticing problems with the house. In 2003, the Maywalds contacted DTH regarding "cracking in the ceiling, in the living room and some nail pops[.]" DTH sent a repair crew and the crew put putty in the cracks

and painted the sheetrock. According to Mary, she contacted DTH four to eight months later for additional repairs, and the Maywalds and DTH "had numerous phone calls back and forth trying to reschedule, reschedule, reschedule" due to scheduling conflicts of both parties. In 2003, a DTH representative looked at the damage and told the Maywalds there was no foundation problem. Mary testified that she believed DTH because they were experts in construction.

Mary testified that up until 2008 they believed the assertions by DTH that there was no foundation problem. The damage had become "[e]xtremely worse" by 2008. In 2008 DTH again represented that there was no foundation problem. After the Maywalds witnessed more cracks in the tile and sheetrock, doors "sticking and coming out of square[,]" "reoccurring nail pops," and the cracks spreading throughout the house and getting worse, the Maywalds decided DTH was lying and that, in fact, there was a foundation problem. The Maywalds filed a claim in 2008 under the ACES warranty. The Maywalds contracted foundation repair companies in 2007 and 2008.

Pursuant to the ACES warranty, homeowners who believe they have a foundation failure must give written notice to the builder no later than thirty days after the expiration of ten years of coverage. The builder then will inspect the foundation and notify the homeowner whether a foundation failure has occurred. If

4

the homeowner disagrees with the determination, the homeowner chooses an inspector from ACES's list of foundation inspectors to inspect the house and determine, pursuant to the Foundation Stability Guide, whether a foundation failure has occurred. If the inspector's report finds no foundation failure, the homeowner has the right to select an engineer from ACES's foundation engineer list to perform an additional inspection. If, after the issuance of the engineer's inspection report, the builder and the homeowner do not agree whether a foundation failure has occurred, then the alternative resolution procedure (requiring mediation) of the warranty applies.

In February 2008, an engineer sent by ACES and a DTH representative visited the Maywald's home. ACES sent another independent engineer in August 2008. Both engineers inspected the home and scored the damage according to a "foundation performance worksheet." A score of "25" or more constituted a "Foundation Failure." Both engineer reports scored the damage to the Maywalds home less than a "25".

Sean Dunbar, Vice President of Operations for DTH, testified that the first time he went to the Maywalds' house was with one of the ACES engineers in 2008. According to Dunbar, there was a drainage problem with the Maywalds' lot because of the Maywalds' addition of a circular driveway and landscaping. The

5

cracks observed by Dunbar appeared to him as only hairline cracks. Dunbar did admit that what he saw was not "normal" but he claimed he was not qualified to say whether or not it constituted foundation failure.

The parties attended a mediation. On May 20, 2009, DTH proposed a settlement offer to re-tile the Maywalds' floor if the Maywalds would install gutters and alter the slope and drainage pattern on the lot to allow for more positive drainage. DTH also offered to pay $1,500 on the Maywalds' attorney fees. Mary testified that in 2009 the cracks were in the foundation and replacing the tile would not have fixed the cracks. In September 2009, the Maywalds filed suit against DTH for DTPA violations, common law and statutory fraud, breach of contract and breach of express warranties, negligent misrepresentation, and breach of common law implied warranties.

Mary testified that at the time of trial she had collected pieces of the tile floor that were coming up, materials that were falling out of the expansion joint, and plaster that had fallen off the ceiling, and these items were admitted into evidence. Photographs of the house in 2009 and just prior to the time of trial were also admitted into evidence. Mary testified that at the time of trial there were more cracks in their house, that the cracks increased in size, and that the longest crack runs all the way across the house.

Gary Boyd, a registered professional engineer, testified for the Maywalds. Boyd visited the Maywalds' house on four occasions. His first visit was in May of 2010. He did not notice anything unusual regarding the driveway. He testified that he saw floor cracks in the ceramic tile that went "all the way across the tile from one extreme to the other." He explained that some of the cracks that "stop and feather down in the bathroom . . . pick up again one or two, three feet over and continue and get wider toward the edge of the foundation." In May of 2010 there were signs of distress in the sheetrock and symptoms of "differential foundation movement or at least from movement which is due to foundation movement." Concerning the exterior of the house, Boyd noted that the expansion joint in the brick veneer had separated. He described the foundation settlement as "moving beyond what is tolerable." He took measurements of elevations, slopes, and deflections, and determined that the Maywalds' foundation was defective. Boyd testified that the Maywalds' house was not built according to the plans and specifications provided to the Maywalds by DTH. Boyd explained that the deviances make a difference in the foundation's performance. Boyd's expert opinion was that the foundation was not built in a good and workmanlike manner. In determining the foundation is defective, Boyd used the Standard Guideline for

Engineers which gives criteria to use to determine whether or not a foundation passes or fails.

Boyd explained that the proper way to repair the foundation would be to lift the foundation by tunneling under the house and putting perimeter piers around the outside. Because this process would impact the drain line system, Boyd included plumbing in determining the necessary cost of repairing the foundation and testified that the total cost would be $55,000-$60,000. In May 2010, a construction consultant for the Maywalds estimated that, in addition to the foundation repair, the repairs to the interior of the home would be $43,672.06.

JURY VERDICT

The jury found that DTH engaged in a false, misleading, or deceptive act or practice, and that the Maywalds relied on, to their detriment, the act or practice that proximately caused their damages. The jury also found that DTH's failure to comply with a warranty proximately caused the Maywalds' damages, and that DTH failed to comply with its agreement with the Maywalds. The jury found that the percentage of responsibility for the damages to the Maywalds' house should be attributed 15% to the Maywalds and 85% to DTH. The trial court denied DTH's motion for judgment notwithstanding the verdict, and signed a judgment awarding damages, prejudgment interest, and attorney fees.

8

THE DISCOVERY RULE

In their first two issues, appellants argue the trial court erred in denying their motion for judgment notwithstanding the verdict. Contending the Maywalds' claims are barred by the statute of limitations, appellants first assert the Maywalds did not plead the discovery rule. The facts pleaded in the Maywalds' petition and the evidence admitted regarding when the Maywalds discovered the damage put DTH on notice that the Maywalds were seeking the application of the discovery rule. The evidence relating to the application of the discovery rule was introduced without objection. It was not until DTH made its motion for directed verdict that DTH argued that the Maywalds failed to plead the discovery rule. The trial court reasonably concluded that the application of the discovery rule was tried by consent. *Parker v. Parker*, 897 S.W.2d 918, 929 (Tex. App.—Fort Worth 1995), *disapproved of on other grounds*, *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *see generally Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 636-37 (Tex. 1982).

The appellants also argue that, when the discovery rule is applied, the Maywalds' claims of negligent misrepresentation and DTPA violations accrued before September 2, 2007, and that the Maywalds' claims of breach of contract and breach of express or implied warranty accrued by December 31, 2007. The

9

Maywalds filed suit in September 2009. The discovery rule is a limited exception to the statute of limitations. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). When the nature of the injury is inherently undiscoverable, courts apply the discovery rule. *Id.* at 456. Only when it is difficult for the injured party to learn of the negligent act or omission should the discovery rule be applied. *Id.* (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)). For both DTPA and common-law causes of action, accrual occurs when the plaintiff knew or should have known of the wrongful injury. *KPMG Peat Marwick v. Harrison Cnty. Fin. Corp.*, 988 S.W.2d 746, 749-50 (Tex. 1999); *see also* Tex. Bus. & Com. Code Ann. § 17.565 (West 2011).

The Supreme Court in *Gonzales v. S.W. Olshan Found. Repair Co., LLC.*, No. 11-0311, 2013 Tex. LEXIS 231 (Mar. 29, 2013), recently discussed the discovery rule in the context of DTPA claims in a foundation case. There, the homeowner hired a plumber to repair water leaks under the homeowner's foundation and hired Southwest Olshan Foundation Repair Company to repair foundation problems. *Id.* at **2-3. The foundation repair contract included a "lifetime, transferrable warranty on the work requiring Olshan to adjust the foundation due to settling." *Id.* at *3. The contract further provided that Olshan

"'perform all the necessary work in connection with this job . . . in a good and workmanlike manner.'" *Id.*

In April 2002, Gonzales noticed doors not locking, windows not opening, and new cracks appearing in previously repaired walls. *Id.* She notified Olshan and her property insurer and both informed her there were additional plumbing leaks. *Id.* In May 2003, Olshan excavated tunnels under the house and a plumbing company repaired the leaks. *Id.* In August 2003, Olshan leveled the foundation. *Id.* Olshan leveled the foundation again in October 2003 and, according to Gonzales, an Olshan employee informed her during this work that Olshan was "'not doing a good job under the home. . . . In fact, it's the worst job I have ever seen.'" *Id.* at **3-4. The employee warned Gonzales not to allow Olshan to fill in the tunnels because the foundation had not been repaired properly, and he told her to contact an attorney. *Id.* at *4. She did not allow Olshan to fill the tunnels despite Olshan's continued representations that there was no problem and that they needed to fill in the tunnels. *Id.* at **4-5. In May 2006, Gonzales noticed more cracking and hired an engineer to inspect her home. *Id.* at *5. The engineer determined that Olshan improperly repaired the foundation. *Id.* Gonzales filed suit in June 2006. *Id.*

The Supreme Court held that Olshan's express warranty superseded the implied warranty of good and workmanlike repair, and the jury's finding that

11

Olshan did not breach the express warranty precluded liability on Gonzales's warranty claims. *Id.* at *7. As for Gonzales's DTPA claims, the Supreme Court held that they were time-barred because her conversation with the Olshan employee conclusively established that she knew of the injury in October 2003. *Id.* at *16.

Mary explained that until 2008 she relied on DTH's representations that there was no foundation problem and that the cracks were attributable to normal settlement. Mary testified that in 2008 she no longer believed DTH's representations and filed an ACES warranty claim. In May 2009, DTH offered to retile the Maywalds' flooring if the Maywalds would alter the drainage pattern of their property. The jury found that the Maywalds "knew of, or, in exercise of reasonable diligence, should have discovered the injury to their property" by January 2008, and that the Maywalds should "have discovered all the false[,] misleading, or deceptive acts or practices of Design Tech" by May 2009. The lawsuit was filed in September 2009, within two years of when the jury found the Maywalds should have discovered the foundation problems. Considering the evidence presented, the jury could reasonably find that the Maywalds relied on DTH's representations; sufficient evidence supports the jury's findings. The trial

court did not err in denying the motion for judgment notwithstanding the verdict. Issue one is overruled.

THE DISCLAIMER

In their second issue, DTH contends that the trial court should have dismissed all express or implied warranty claims because all warranties, except the ACES warranty which was not breached, were disclaimed in the Construction Agreement. But after the agreement disclaiming warranties, the parties on March 14, 2000, executed the Residential Construction Contract. The Residential Construction Contract stated that DTH would construct the house in "a good and workmanlike manner according to the [p]lans and [s]pecifications." The contract provided that any previous work agreement or construction contract "shall not amend, supersede or qualify in any way the terms and conditions of this Contract[,]" and also provided that the contract constituted "the final expression of the parties with respect to the matters in it, all other discussions, agreements and contracts being replaced and merged herein." The trial court did not err in giving effect to the language of the parties' final written agreement.

Relying on *Gonzales*, DTH argues that the Maywalds were limited to an express warranty claim under the ACES limited warranty "which was neither pled nor proven" because the express warranty to perform the work in a good and

13

workmanlike manner "supersedes the common law gap-filling warranty of good and workmanlike performance." The Supreme Court held in *Gonzales* that Olshan's express warranty to perform the work in a good and workmanlike manner superseded the implied warranty of good and workmanlike repair. *Gonzales*, 2013 Tex. LEXIS 231, at \*8. In that case, unlike here, the jury found the express warranty was not breached. The Maywalds do not rely on a "gap-filling" implied warranty. The Residential Construction Contract includes an express warranty of good and workmanlike performance. Issue two is overruled.

SUFFICIENCY OF THE EVIDENCE

In issues three, four, and five, DTH raises legal sufficiency points: no evidence that DTH breached the ACES warranty or that any workmanship issue proximately caused failure, no evidence that supports a finding of "reliance" or "proximate cause" under the DTPA, and no evidence to support a finding of liability under the doctrine of negligent misrepresentation. When confronted with conflicting evidence, a factfinder may sometimes rationally choose to believe one witness and disbelieve another, may resolve inconsistencies in the testimony of any witness, or may reject expert testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005). In addition to the evidence that two engineers sent out by ACES determined that the Maywalds' foundation had not failed, the jury also

heard Boyd's expert testimony that the Maywalds' foundation was defective and was not constructed in a good and workmanlike manner. Despite the express warranty in the final Residential Construction Contract, DTH attempted to limit the home warranty to the ACES limited warranty. The jury viewed photographs of the condition of the house at various times. Boyd testified that DTH failed to follow the foundation plans and specifications that were part of the agreement between the parties, and that the deviations from the plans and specifications resulted in the foundation problems. In addition to Boyd's testimony, the jury heard Mary Maywalds' testimony concerning the false representations of DTH and her reliance upon them. The evidence is legally sufficient to support the jury's findings. Issues three, four, and five are overruled.

## THE DTPA DAMAGES

In their sixth issue, DTH asserts that the Residential Construction Liability Act in the Texas Property Code bars mental anguish damages and damages for a "knowing" violation of the DTPA. DTH maintains that section 27.004(g) provides the exclusive list of recoverable damages in a construction defect case. *See* Tex. Prop. Code Ann. § 27.004(g) (West Supp. 2012). The Maywalds are seeking to recover damages arising from a construction defect. *See id.* § 27.002(a)(1) (West

Supp. 2012).[1] The RCLA controls to the extent of a conflict with other laws, including the DTPA. *Id.* § 27.002(b) (West Supp. 2012).

Section 27.004(g) provides the following:

Except as provided by Subsection (e), in an action subject to this chapter the claimant may recover only the following economic damages proximately caused by a construction defect:

(1) the reasonable cost of repairs necessary to cure any construction defect;
(2) the reasonable and necessary cost for the replacement or repair of any damaged goods in the residence;
(3) reasonable and necessary engineering and consulting fees;
(4) the reasonable expenses of temporary housing reasonably necessary during the repair period;
(5) the reduction in current market value, if any, after the construction defect is repaired if the construction defect is a structural failure; and
(6) reasonable and necessary attorney's fees.

Tex. Prop. Code Ann. § 27.004(g).

Asserting that the RCLA does not bar claims for mental anguish and for "exemplary" damages under the DTPA, the Maywalds rely on this Court's opinion in *Sanders v. Construction Equity, Inc.*, 42 S.W.3d 364 (Tex. App.—Beaumont

---

[1] Because the Maywalds' cause of action accrued in 2008 and none of the subsequent amendments affect the outcome of this appeal, the current version of sections 27.002, 27.003, and 27.004 of the Texas Property Code applies. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 458, § 2.07(a), 2003 Tex. Gen. Laws 1703, 1728 ("The changes in law made by this article to Sections 27.002, 27.003, and 27.004, Property Code, apply only to a cause of action that accrues on or after the effective date of this Act."); Act of May 24, 2007, 80th Leg., ch. 843, §§ 2, 3, 2007 Tex. Gen. Laws 1752, 1753.

2001, pet. denied). This Court held in *Sanders* that the RCLA limits compensatory damages in construction defect cases to those enumerated in section 27.004. *See Sanders*, 42 S.W.3d at 372. In *Sanders* we addressed a prior version of section 27.004. The Legislature changed the limitation for "damages" to a limitation on the "economic damages," and also defined economic damages. *See* Tex. Prop. Code Ann. §§ 27.004(g); 27.001(6) (West Supp. 2012).

In the final judgment, the trial court awarded the Maywalds "actual damages in the amount of $72,675.00, plus prejudgment interest in the amount of $5,985.59, plus additional damages pursuant to Chapter 17 of the Texas Business and Commerce Code in the amount of $20,000.00, for a total amount of $98,660.59." Although the jury verdict also included a finding of $10,000 for mental anguish, the trial court apparently did not include that amount in the final judgment.

In DTH's motion for judgment notwithstanding the verdict, DTH requested that the trial court sign a JNOV reflecting a take-nothing judgment, or in the alternative, sign a judgment that did not include $20,000 for a "knowing" violation of the DTPA. DTH argues on appeal that the $20,000 DTPA additional damages should be deleted.

Additional damages for "knowing" violations under the DTPA are considered punitive in nature. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners*

17

*Ltd. P'ship,* 146 S.W.3d 79, 89 (Tex. 2004). Section 27.004(g) restricts economic damages, not punitive damages. *See Sanders*, 42 S.W.3d at 371-72 (exemplary damages not precluded by RCLA); *see also* Tex. Prop. Code Ann. §§ 27.004(g); 27.001(6) (Economic damages do "not include exemplary damages or damages for physical pain and mental anguish . . . [.]"). RCLA does not bar additional damages under the DTPA for knowing violations. Issue six is overruled. The trial court's judgment is affirmed.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on January 17, 2013
Opinion Delivered June 13, 2013

Before Gaultney, Kreger, and Horton, JJ.