Opinion issued September 29, 2003

     






In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00287-CV




FRED A. BEASLEY, Appellant

V.

HUB CITY TEXAS, L.P., Appellee




On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2002-62901




MEMORANDUM OPINION
          Appellant, Fred A. Beasley, appeals an order temporarily enjoining him from
competing with his former employer, appellee, Hub City Texas, L.P. (“Hub”). See
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2003). We
decide whether the trial court abused its discretion in concluding that Hub showed (1)
a probable right to the relief sought and (2) probable, imminent, and irreparable injury
pending trial. We affirm.
Background
          From 1989 until 1998, Beasley was the 20-percent owner and president of
Quality Intermodal Corporation (“Quality”). Quality provided transportation and
logistic services similar to those that would later be provided by Hub. In April 1998,
Quality’s owners sold it through a stock-purchase agreement to Hub Holdings, Inc.
for $10 million. Beasley received $2.5 million in the sale. The resulting company
was appellee Hub. Hub is in the intermodal transport business, meaning that it is not
an asset-based company, but one that functions as an intermediary by arranging for
the transportation of goods using a variety of carriers.
          As part of the stock-purchase agreement, Beasley and two other Quality
executives signed a three-year employment contract with Hub (“the 1998 employment
contract”). Pursuant to that contract, Beasley became Hub’s executive vice-president,
in which position he supervised sales and was responsible for the truck-brokerage
division. Section 7 of the 1998 employment contract contained a non-competition
covenant (“the 1998 non-competition covenant”). At the temporary-injunction
hearing, Beasley’s attorney took the position that sufficient consideration had
supported the 1998 non-competition covenant and that Beasley did not base his court
challenge on that covenant. 
          In January 2000, during Beasley’s three-year employment term, the parties
amended the 1998 employment contract (“the 2000 amendment”) as part of Beasley’s
being promoted to president of Hub. The 2000 amendment provided in pertinent part
as follows:
WHEREAS, [Hub] and [Beasley] entered into . . . the [1998
employment contract] . . .;
 
WHEREAS, [Hub] plans to promote [Beasley] to President of
[Hub] and in conjunction therewith allow [Beasley] to participate in the
Hub Group bonus plan for Principals;
 
WHEREAS, [Hub] and [Beasley] also desire to enter into [Hub’s]
standard non-competition covenant;
 
NOW THEREFORE, in consideration of the mutual covenants
and agreements set forth below, it is hereby covenanted and agreed by
[Hub] and [Beasley] as follows:
 
1.Bonus. [Beasley] hereby irrevocably waives any and all rights he
may have to any bonus payment under the [1998 employment contract]. 
[Beasley] and [Hub] agree that Exhibit A to the [1998 employment
contract] is hereby deleted from the [1998 employment contract] and
replaced with Exhibit A attached hereto.
 
2.Non-Competition. [Beasley] and [Hub] agree that Section 7 of the
[1998 employment contract] is hereby deleted and replaced with the
separate Non-Competition Agreement entered into by and between
[Beasley] and [Hub] as of January 24, 2000 . . . , a copy of which is
attached hereto as Exhibit B, such that any violation of the Non-Competition Agreement shall be deemed a violation of Section 7 of the
[1998 employment contract].

          The non-competition covenant (“the 2000 non-competition covenant”) that was
incorporated into the 2000 amendment, in turn, provided in pertinent part as follows:
WHEREAS, [Beasley] is being offered the office of President of
[Hub] in exchange for [his] agreement to the provisions of this
Agreement; and
 
WHEREAS, Hub Group has agreed to make an award of stock
options to [Beasley] in exchange for [his] agreement to the provisions
of this Agreement;
 
NOW, THEREFORE, in consideration of the foregoing and other
good and valuable consideration, the receipt and sufficiency of which
hereby are acknowledged, the parties hereto agree as follows:
 
. . .
 
Section 2. Noncompetition/Nonsolicitation Agreement.


 During
the term beginning on the date hereof and continuing until one (1) year
after the date that [Beasley] is no longer an employee of [Hub] or any of
its affiliates, [Beasley]:
 
(a)shall not, directly or indirectly, engage in the
ownership, management or operation of, or the solicitation of business
for, any Intermodal Transport Business


 on behalf of any Person other
than [Hub] or its affiliates; . . . ;
 
(b)shall not divert or attempt to divert any party who is
[a] customer of [Hub] or its affiliates; . . .;
 
(c)shall not divert or attempt to divert any party who
was solicited to become [a] customer of [Hub] or its affiliates; . . . ;

 
(d)shall not disturb or attempt to disturb any business
relationship between any third party and [Hub] or any of its affiliates;
 
(e)shall not, except in connection with his duties for
[Hub], directly or indirectly, contact or communicate with any person
who is employed by [Hub] or its affiliates on [Beasley’s] last day of
employment with [Hub] and its affiliates regarding possible employment
or association with any entity or person other than [Hub] and its
affiliates;


 and
 
(f)shall present to [Hub] all opportunities to acquire any
interest or to engage in the Intermodal Transport Business, which
opportunities [Beasley] or [his] affiliates would be entitled to pursue on
their own behalf but for the terms of this Agreement.
 
To the extent that [Beasley] is prohibited from taking any action
pursuant to the foregoing provisions of this Section 2, [Beasley] shall
cause [his] Affiliates not to take any such action and to the extent
[Beasley] is required to take any action pursuant to the foregoing
provisions of this Section 2, [Beasley] shall cause [his] Affiliates to take
any such action.
 
. . .
 
Section 4. Confidential Information.



 
(a)[Beasley] acknowledges that, by virtue of [his]
employment by [Hub], [he] will be granted otherwise prohibited access
to confidential and proprietary data of the Hub Group, [Hub] and their
respective affiliates[,] which information is not known to competitors of
Hub Group or [Hub] or their respective affiliates, or otherwise. This
information (herein, the “Confidential Information”) includes, but is not
limited to: (i) specialized strategies, practices and procedures for
obtaining and maintaining clients; (ii) computer systems, software
programs and related enhancements of Hub Group and [Hub] and their
respective affiliates or of the clients of the foregoing; (iv) [sic] policies,
practices and procedures relating to pricing of services, including
agreements with the providers of transportation and the related fee
schedules; (v) ongoing service agreements information relating to the
identity of clients of Hub Group or [Hub] and their respective affiliates;
(vi) key contacts at such clients; (vii) specifics concerning the nature
and extent of services previously or currently being provided to or
planned for such clients; and (viii) any other essential information
concerning such clients’ particularized needs. [Beasley] agrees that,
beginning on the date hereof and continuing until two (2) years after the
date [Beasley] is no longer an employee of [Hub] or any of its affiliates,
[Beasley] will not, without the prior written consent of [Hub], directly
or indirectly, divulge any Confidential Information or make use of it for
[his] own purposes or the purposes of another or to use it in any way. .
. .
 
Section 5. Reasonable and Necessary Restrictions. [Beasley]
acknowledges that the restrictions, prohibitions and other provisions
hereof are reasonable, fair equitable in scope, terms and duration, are
necessary to protect the legitimate business interests of [Hub], Hub
Group and their respective affiliates, and [Beasley] understands and
agrees that Hub Group is awarding stock options to [him] in
consideration of [his] agreement to the provisions set forth herein.
 
Section 6. Specific Performance. [Beasley] acknowledges that
the obligations undertaken by [him] pursuant to this Agreement are
unique and that neither [Hub] nor Hub Group will have an adequate
remedy at law if [Beasley] shall fail to perform any of [his] obligations
hereunder, and [Beasley] therefore confirms that the right of [Hub] and
Hub Group to specific performance of the terms in this Agreement is
essential to protect the rights and interests of [Hub] and Hub Group. 
Accordingly, in addition to any other remedies that [Hub] and Hub
Group may have at law or in equity, . . . and [Hub] and Hub Group shall
have the right to obtain preliminary and permanent injunctive relief to
secure specific performance and to prevent a breach or contemplated
breach of this Agreement by [Beasley] . . . .

(Emphasis added.)
          Beasley did not object to any provision of the 2000 amendment or the 2000
non-competition covenant and was represented by legal counsel when he read and
signed them. Pursuant to the 2000 amendment, Beasley became Hub’s president. As
president, Beasley managed Hub’s entire operation. He also became eligible to
participate and did participate in the principal bonus plan to some extent and received
a stock-option grant of 5,000 shares. Beasley understood that these benefits were
contingent upon his signing the 2000 amendment.
          Beasley resigned from Hub in October 2002. In January 2003, Beasley and two
other former presidents of Hub entities became owners and officers of Integra
Logistics (“Integra”), one of Hub’s competitors in the intermodal transport business. 
At the time of the temporary-injunction hearing, Integra had hired or intended to hire
Hub employees; Integra had offices in some of the states in which Hub did business;
and Beasley had contacted four Hub clients on Integra’s behalf. Beasley admitted
that his actions with Integra, with at least some of Hub’s employees, and with at least
one of Hub’s customers would violate the 2000 non-competition covenant, if that
covenant was enforceable.
          In December 2002, Beasley filed a declaratory judgment action to determine
the validity of the 2000 non-competition covenant and to declare that he had taken
no confidential or proprietary information of Hub’s. Hub counterclaimed for
threatened and actual breach of contract, threatened and actual misappropriation of
trade secrets and confidential information, unfair competition, and conspiracy to
commit various wrongs and moved for temporary and permanent injunctive relief. 
The trial court entered a temporary restraining order. On March 6, 2003, following
an evidentiary hearing, the trial court entered an order temporarily enjoining Beasley
from (1) owning, managing, operating, or soliciting business for any intermodal
transport business operating in Texas; (2) contacting, communicating with, or
soliciting any of Hub’s customers located anywhere; and (3) contacting or
communicating with any Hub employees about employment with any other person
or entity. The temporary-injunction order contained fact findings and legal
conclusions. Beasley appeals.
 
 
Standard of Review
          “We may not review the merits of the applicant’s case in an interlocutory
appeal from a temporary-injunction order.” Cardinal Health Staffing Network, Inc.
v. Bowen, 106 S.W.3d 230, 234 (Tex. App.—Houston [1st Dist.] 2003, no pet.). 
“Whether to grant or deny a temporary injunction lies within the trial court’s sound
discretion. We [thus] view the evidence in the light most favorable to the trial court’s
order and indulge every reasonable inference in its favor.” id. Because there is a
reporter’s record and because the trial court’s order contained fact findings and legal
conclusions, we will sustain the fact findings if there is evidence to support them, and
we will review the legal conclusions de novo.


 See CRC-Evans Pipeline Int’l, Inc. v.
Myers, 927 S.W.2d 259, 263 (Tex. App.—Houston [1st Dist.] 1996, no writ).
Temporary Injunction
          A temporary-injunction applicant must plead and prove (1) a cause of action,
(2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable
injury in the interim.


 Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002). 
A temporary injunction’s purpose is to preserve the status quo of the litigation’s
subject matter pending a trial on the merits. Bowen, 106 S.W.3d at 235.
A.      Probable Right of Recovery
          In issues one through three, Beasley challenges the non-competition covenant’s
validity and enforceability. We construe these arguments as contending that Hub did
not show a probable right of recovery. To determine whether the applicant has a
probable right of recovery, the court examines whether the applicant has a cause of
action; the applicant need not establish that it will prevail at trial. See Walling v.
Metcalfe, 863 S.W.2d 56, 58 (Tex. 1993). 
          1.       Enforceability of Non-Competition Covenants
          A non-competition covenant’s enforceability is a question of law for the court.
Light v. Centel Cellular Co., 883 S.W.2d 642, 644 (Tex. 1994). To be enforceable,
a noncompetition covenant must (1) be ancillary to an otherwise enforceable
agreement at the time that the agreement is made and (2) contain limitations of time,
geographic area, and scope of activity that are reasonable and that do not impose a
greater restraint than necessary to protect the promisee’s goodwill or other business
interest. Tex. Bus. & Com. Code Ann. § 15.50 (Vernon Supp. 2003); Light, 883
S.W.2d at 644. Beasley challenges the 2000 non-competition covenant only on the
first ground, i.e., the requirement that it be ancillary to an otherwise enforceable
agreement. For a non-competition covenant to be “ancillary to or part of” an
otherwise enforceable agreement at the time that the agreement was made,
1.the consideration given by the employer in that agreement must
give rise to the employer’s interest in restraining the employee
from competing and
 
2.the covenant must be designed to enforce the employee’s
consideration or return promise in that agreement. 

Light, 883 S.W.2d at 647. 
          2.       Discussion of Beasley’s Challenges
          In fact finding 13, the trial court found that the 2000 amendment—in addition
to providing for Beasley’s promotion to president, making him eligible to participate
in the principle bonus plan, and allowing him to receive 5,000 stock
options—provided that Beasley would “receive access to confidential information
that he did not have access to in his prior role as Executive Vice President.” In fact
finding 19, the trial court also found that, while Beasley served as president, he “was
responsible for managing the operations of the company and gained access to
confidential information.” In legal conclusions two and three, the trial court
concluded that Beasley’s “Non-Competition Agreement” was valid and that Hub had
established a substantial likelihood of success on the merits. In issue two, Beasley
argues that, because “Hub did not make a showing that it provided confidential or
trade secret information to Beasley” upon his becoming president, the 2000 non-competition covenant lacked sufficient consideration and was unenforceable. We
construe Beasley’s issue two as attacking fact findings 13 and 19 and legal
conclusions two and three.
          In section 4(a) of the 2000 non-competition covenant, Beasley acknowledged
“that, by virtue of [his] employment by [Hub], [Beasley] will be granted otherwise
prohibited access to confidential and proprietary data of the Hub Group, [Hub] and
their respective affiliates[,] which information is not known to competitors of Hub
Group or [Hub] or their respective affiliates, or otherwise.” (Emphasis added.) This
Court has previously treated an employee’s acknowledgment that he has or will
receive trade secrets and confidential information from his employer as an implied
promise that the employer will provide trade secrets and confidential information. 
See Myers, 927 S.W.2d at 265. In exchange, Beasley promised that he would not
divulge or make use of that information without Hub’s prior written consent. An
employer’s promise to provide confidential information or trade secrets, in exchange
for an employee’s agreement not to divulge or to use that information, forms an
“otherwise enforceable agreement” to which the employee’s non-competition
covenant can be ancillary and pursuant to which the covenant can be enforceable. 
See Light, 883 S.W.2d at 647 n.14; Curtis v. Ziff Energy Gr., Ltd., 12 S.W.3d 114,
118 (Tex. App.—Houston [14th Dist.] 1999, no pet.). 
          A trade secret is “any formula, pattern, device or compilation of information
which is used in one’s business and presents an opportunity to obtain an advantage
over competitors who do not know or use it.” Computer Assocs. Int’l, Inc. v. Altai,
Inc., 918 S.W.2d 453, 455 (Tex. 1996). To enjoy the status of a trade secret, the
information must not be generally known or readily available. Gonzales v. Zamora,
791 S.W.2d 258, 264 (Tex. App.—Corpus Christi 1990, no writ). “When an effort
is made to keep material important to a particular business from competitors, trade
secret protection will be available.” Id. Under the right circumstances, “[i]tems such
as customer lists, pricing information, client information, customer preferences, buyer
contacts, market strategies, blueprints, and drawings have been shown to be trade
secrets.” Evan’s World Travel, Inc. v. Adams, 978 S.W.2d 225, 231 (Tex.
App.—Texarkana 1998, no pet.).
          Beasley argues that all information that he received upon becoming president
was either not confidential or was confidential information that he had already
received as vice-president; that the only confidential information that he received at
Hub thus came to him pursuant to the 1998 employment contract; and that the
confidential information promised in 1998 cannot support a non-competition
covenant in 2000.


 However, some of the testimony to which Beasley cites was not
admitted as evidence at the temporary-injunction hearing,


 and much of the evidence
on which Beasley relies is not viewed in the required light.


 In contrast, the evidence
viewed in the required light supports the court’s findings that Beasley was promised
and received new, confidential information upon signing the 2000 amendment and
becoming president.
 
          For example, there was evidence that Hub had Beasley execute the 2000
amendment specifically because, as president, he would be privy to new confidential
information. Hub’s evidence showed that it considered the following matters
confidential and proprietary:
●Pricing that was negotiated with trucking companies and rail
carriers. This pricing was generally not publicly available and,
to be competitive, had to be negotiated separately with “quite a bit
of time and effort.”
 
●Hub’s transaction margins and margins analyses. There was
a gross margin per transaction that was added onto each move and
that “varie[d] widely” among transactions.
 
●Hub’s incentive program. Incentive compensation was
negotiated with each major “Class 1” railroad. The incentive was
generally negotiated on volume, could be “lane-specific,” and
varied from one carrier and intermodal transport company to
another.
●Hub’s overall profit-and-loss performance.
 
●Hub’s customer contracts.
 
●Certain information discussed at the meetings of Hub’s
“principals,” i.e., its presidents. The meetings were “high level
discussion[s]” at which Hub-entity presidents discussed
information such as detailed strategy, Hub’s overall direction,
new opportunities, and new products.
 
●“Plans” and “analysis . . . regarding margin” on “Hubu,” a
confidential program possessed only by Hub. Beasley admitted
that Hubu gave Hub a “competitive advantage.” Although
Beasley testified that he learned nothing new about Hubu as
president that he had not already learned as vice-president, Hub
presented evidence that Beasley should not have had access to
that kind of information before having become president.

          Mark Yeager, president of field operations of Hub Group, Inc., testified that
Hub-related entities tried to protect the above confidential information (1) by having
presidents execute non-competition covenants; (2) by having confidentiality
agreements, which bound every Hub employee, in Hub’s employee handbooks; (3)
by storing certain information in databases that were password protected; (4) by
limiting access to Hub’s offices to employees and their guests and by requiring the
use of key cards; (5) by locking some office files that contained matters like pricing
information, customer lists, and compensation information; and (6) by limiting certain
information to certain employees.
          The only Hub employee who had full access to all information was the
president. Additionally, Beasley began attending principal meetings only after having
been promoted to president. Thus, upon becoming president, Beasley would have
been made privy to full information on Hub’s profit-and-loss performance, incentive
agreements, margin-analysis tools, customer contracts, and the like. Beasley should
not have had access to much of, or at least to the full amount of, this information
before having become president. 
          Therefore, viewed in the appropriate light, sufficient evidence supported the
trial court’s finding that Hub promised to provide and actually did provide Beasley
with new confidential information in exchange for his signing the 2000 amendment,
including its non-competition and non-disclosure covenants.


 The trial court had to
find only one non-illusory promise to support the non-competition covenant. See
Ireland v. Franklin, 950 S.W.2d 155, 158 (Tex. App.—San Antonio 1997, no pet.). 
This promise sufficed. We thus need not reach Beasley’s alternate arguments under
issue one, concerning the validity of other consideration (stock options, salary
increase, and bonus) given for the 2000 amendment, or under issue three, concerning
whether the consideration underlying the 1998 agreements (stock sale, three-year
employment term, initial receipt of confidential information) could support the 2000
non-competition covenant.
          We overrule issues one through three.
B.      Irreparable Injury
          In fact findings 21 through 34, the trial court found that Beasley and other Hub-entity presidents founded and owned Integra; that Integra was Hub’s competitor; that
Beasley communicated with Hub employees in an attempt to obtain business; that
Integra had hired one Hub employee and would shortly be hiring others; and that
Beasley had solicited five Hub customers for Integra. In legal conclusion four, the
trial court determined that Hub “has suffered and will continue to suffer substantial
and irreparable harm if an injunction is not granted . . . .” In issue four, Beasley
argues that Hub did not carry its burden of showing probable irreparable injury. We
construe Beasley’s issue four as attacking fact findings 21 through 34 and legal
conclusion four.
          To establish an irreparable injury, the applicant must show that it cannot be
“adequately compensated in damages or the damages cannot be measured by any
certain pecuniary standard.” Bowen, 106 S.W.3d at 235. The applicant thus has to
establish that there is no adequate remedy at law for damages. Id. “An adequate
remedy at law is one that is as complete, practical, and efficient to the prompt
administration of justice as is equitable relief.” Id. 
          Again, Beasley cites to Mark Yeager’s deposition testimony, which was not
evidence, and to evidence that is not in the light most favorable to the trial court’s
ruling. Viewed in the appropriate light, there was evidence to support the trial court’s
findings and conclusion on irreparable injury. Hub was a non-asset-based company,
making its relationships with vendors and customers and its reputation its primary
assets. When Hub purchased Quality, it purchased the “types of things that would be
associated with” an intermodal transport business, such as business relationships,
customer goodwill, excellent reputation, vendor contacts, pricing, solid management,
and an experienced workforce. In order to preserve the value of Quality’s intangible
assets and its workforce, Hub required Beasley to become a Hub employee as part of
the sale. Because Hub had seen “disastrous” results with other businesses in the
industry that had made purchases without requiring non-competition agreements, Hub
would not have bought Quality or made Beasley president if he had not signed the
agreements that he did.
          There was testimony that Integra had hired at least one Hub employee, would
or might hire three others, and had had “numerous . . . calls” from other Hub
employees inquiring about employment at Integra; that Integra’s two other owners
had been employees of Hub-related entities; and that Beasley had been in contact with
four clients of Hub-related entities. Three of these companies with which Integra had
communicated were within the top five customers of a Hub entity in Tennessee. 
Although Hub had not yet lost any customers to Integra, Hub feared that it would lose
customers because Integra had taken Hub employees who were responsible for, who
knew pricing for, and who serviced specific customer accounts. Mark Yeager also
testified that Hub had been harmed by having lost experienced salespersons to
Integra, which losses had resulted in instability and turmoil within the organization’s
employee base and the loss of “quite a bit” of knowledge. He also testified that
money would not replace lost customer relationships, the experience of lost
employees, or the “momentum” that Hub had thereby lost in the “critical” Texas
intermodal transport market.
          Moreover, Beasley had been a highly-ranked Hub employee who admitted that
some of his post-employment actions violated the 2000 non-competition covenant if
that agreement was valid. Evidence that a highly trained employee is continuing to
breach a non-competition covenant gives rise to a rebuttable presumption that the
applicant is suffering an irreparable injury. Bowen, 106 S.W.3d at 236. Additionally,
we note that Beasley acknowledged in section six of the 2000 non-competition
covenant that Hub would not have an adequate legal remedy if Beasley breached the
agreement and that Hub thus had the right to seek injunctive relief.
          We overrule issue four.
Conclusion
          We affirm the order of the trial court.
 
 
Tim Taft
Justice

Panel consists of Justices Taft, Jennings, and Hanks.