**HUNT OIL COMPANY,**
Appellant/Cross–
Appellee,

v.

**LIVE OAK ENERGY, INC.,**
Appellee/Cross–
Appellant.

No. 05–07–01553–CV.

Court of Appeals of Texas,
Dallas.

Oct. 19, 2009.

Rehearing Overruled June 18, 2010.

Scott P. Stolley, David R. Noteware, Thompson & Knight LLP, Dallas, TX, for Appellant/Cross–Appellee.

Charles T. Frazier, Jr., LaDawn H. Conway, Alexander Dubose Jones & Townsend LLP, Frank L. Broyles, Goins, Underkofler, Crawford & Langdon, Dallas, TX, for Appellee/Cross–Appellant.

Before Justices WRIGHT, BRIDGES, and O'NEILL.

## OPINION

Opinion By Justice BRIDGES.

Live Oak Energy, Inc. sued Hunt Oil Company for negligence and breach of contract arising out of Hunt Oil's drilling in a Louisiana oilfield. A jury found Hunt Oil was negligent, and awarded Live Oak over $5 million in damages. Hunt Oil's seven issues on appeal complain the statute of limitations ran on Live Oak's claims; Live Oak had no standing to recover for an injury that occurred before it purchased the oil field in question; Hunt Oil's conduct was not a proximate cause of injury to Live Oak as a matter of law; Live Oak could not recover for its economic loss

under Louisiana law; and Live Oak could not recover the replacement cost of the oil, incidental damages, or prejudgment interest. In its cross-appeal, Live Oak asserts the evidence conclusively establishes it suffered $8,772,000 for repair costs. Because the statute of limitations had run on Live Oak's negligence claim before Live Oak filed suit against Hunt Oil, we reverse the trial court's judgment and render judgment for Hunt Oil.

## BACKGROUND

In 2002, Live Oak acquired a leasehold interest in the Pettit geological formation located in the East Haynesville oil field in northwest Louisiana. The East Haynesville field exceeds 8,000 acres and was discovered in 1945. The Pettit formation is approximately 15 feet thick at a depth of about 5,200 feet. In 1958, the Pettit formation was unitized. By 1972, both primary production and secondary-recovery production by water flooding had been conducted in the Pettit formation, producing approximately 11 million barrels of oil in all.

Live Oak purchased its interest from Story Oil & Gas Co. for $465,000. Live Oak planned to attempt to produce oil from the Pettit formation. Prior to Live Oak's purchase, Hunt Oil drilled some fifty wells through the Pettit formation to recover oil in formations below. After Live Oak's purchase, Hunt Oil drilled four additional wells. Live Oak contends Hunt Oil failed to protect the Pettit formation by failing to cement thirty of the previously-drilled wells and the four additional wells as required by law. Live Oak alleges these holes created a "leaky bucket" in the Pettit formation, so that Live Oak was unable to recover oil. In its trial brief on damages, Live Oak described the "leaky bucket damages" it sought as "damages caused by the ability of fluids within the Pettit to escape out of the Pettit."

In late September 2004, Live Oak purchased the Butler well in the East Haynesville field from Hunt Oil. After the sale, Live Oak obtained the file for the Butler well from Hunt Oil. Live Oak contends it learned when it reviewed the file that Hunt Oil had not cemented off the Pettit formation in that well. Live Oak completed several wells, including the Butler well, that produced almost exclusively water. Live Oak alleges, "[b]ecause Hunt failed to protect the Pettit, it is not a closed system, and Live Oak could not, and cannot, obtain permission from the State [of Louisiana] to waterflood it." Live Oak asserts that as a result, it lost "substantial oil reserves."

Live Oak sued Hunt Oil on June 23, 2005. At trial, the jury found Hunt Oil's negligence proximately caused damage to Live Oak. The jury awarded Live Oak $925,000 in "incidental damages," and found the "current replacement cost of Live Oak's oil reserves lost" to be $4.3 million. The jury also determined that by October 1, 2004, the operator of the Pettit Unit should have discovered in the exercise of reasonable diligence that Hunt Oil did not "cement off" the formation. The jury found in favor of Hunt Oil, however, on Live Oak's claim for breach of contract. The trial judge entered judgment in favor of Live Oak based on the jury's findings.

## APPLICABLE LAW

Although this case was filed and tried in Texas, the causes of action asserted by Live Oak arose in Louisiana. The parties agree that Texas law applies to procedural issues, and Louisiana law applies to issues of substantive law. *See Intevep, S.A. v. Sena*, 41 S.W.3d 391, 394 (Tex.App.-Dallas 2001, no pet.) ("As a general rule, questions of substantive law are controlled by the laws of the state

where the cause of action arose, but matters of remedy and procedure are governed by the laws of the state where the action is sought to be maintained."). They disagree, however, on whether the application of the statute of limitations to Live Oak's negligence claim presents a substantive issue or a procedural issue. Hunt Oil argues the law of the forum state determines whether a question is substantive or procedural, and Texas law provides that limitations presents a procedural question. Live Oak counters that the "real question is which state's law governs the accrual of a cause of action," and that question is substantive, so Louisiana law applies.

■ We agree with Hunt Oil. As Live Oak concedes, "[g]enerally what is a matter of substance and what is a matter of procedure is determined by the law of the forum state according to its own laws." *PennWell Corp. v. Ken Assocs., Inc.*, 123 S.W.3d 756, 764 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Texas courts have held that limitations presents a procedural issue. *See Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999); *Intevep*, 41 S.W.3d at 394. Live Oak does not distinguish these cases, but instead relies on *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988), for the proposition that "[t]he phrase 'accrues' embodies a substantive law concept. . . ." As we explained in *Intevep*, however, the statute of limitations is considered substantive "when the statute that creates a right of action incorporates an express limitation upon the time within which the suit may be brought." *Intevep*, 41 S.W.3d at 394. Therefore, if a Louisiana statute created the right of action Live Oak asserts in this case and provided a limitations period, Louisiana law would apply. *Id.* If not, we follow the general rule. *See id.* (general rule is that matters of remedy and procedure are governed by law of state where

action sought to be maintained). Live Oak does not argue it is asserting a cause of action under a Louisiana statute that provides a limitations period. We follow the general rule and apply Texas law regarding limitations. *Cf. id.* at 395–96 (Venezuelan law applied where Venezuelan statute created right of action and provided limitations period).

STATUTE OF LIMITATIONS

In its first issue Hunt Oil complains that Live Oak's negligence claim is barred by limitations, and Live Oak cannot avoid limitations by invoking the discovery rule. Live Oak argues that its negligence claim is timely under both Louisiana and Texas law. Because we have determined Texas law applies to the issue of limitations, we consider the parties' arguments under Texas law.

■ Hunt Oil alleges the trial judge erred in denying its objections to the charge, its motion for judgment notwithstanding the verdict, its motions to modify the judgment, and its motions for new trial, all asserting Live Oak's negligence claim is barred by the statute of limitations. This is a legal question we review de novo. *See, e.g., Burke v. Ins. Auto Auctions Corp.*, 169 S.W.3d 771, 776 (Tex. App.-Dallas 2005, pet. denied) (statute of limitations begins to run when cause of action accrues; determination of when cause of action accrues is question of law); *COC Services, Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 662 (Tex.App.-Dallas 2004, pet. denied) (we review questions of law de novo).

Negligence claims must be brought "not later than two years after the day the cause of action accrues." TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon Supp. 2008); *Waxler v. Household Credit Services, Inc.*, 106 S.W.3d 277, 279 (Tex.App.-Dallas 2003, no pet.). Live Oak's original

petition was filed on June 23, 2005. Hunt Oil argues Live Oak's action for negligence accrued more than two years prior to that date.

Live Oak alleged in its original petition that "starting in 1988 and continuing through 2004," Hunt Oil drilled more than 50 wells through the Pettit Unit into formations below. Live Oak further alleges that 34 of these wells were not cased or cemented to protect the producing formations above. In addition, Live Oak complained that Hunt Oil improperly disposed of drilling pit fluids into the Pettit formation. For its negligence claim, Live Oak alleged Hunt Oil "failed to exercise ordinary care in its operations inside the geographical confines of the Pettit Unit" from which both Live Oak and Hunt Oil produce oil and gas. Although Live Oak amended its petition numerous times before trial, it continued to allege that Hunt Oil's negligent failure to protect the Pettit formation in its drilling of wells between 1988 and 2004 was the proximate cause of damages to Live Oak. Hunt Oil pleaded Live Oak's claims were barred by the applicable statutes of limitations, and argues Live Oak's own proof establishes that Hunt Oil drilled thirty of the allegedly unprotected holes between November 1990 and 2002, creating the "leaky bucket" more than two years before suit was filed.

■ Live Oak pleaded that the discovery rule applied to its claims, contending that in the exercise of reasonable diligence it could not have "discovered facts that would have triggered any limitations time period until Plaintiff obtained a well file from Defendant." The discovery rule is a very limited exception to limitations and is construed strictly. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1994) ("the discovery rule, in application, proves to be a very limited exception to statutes of limitation."); *S.V. v.*

*R.V.,* 933 S.W.2d 1, 25 (Tex.1996) ("exceptions to the legal injury rule should be few and narrowly drawn"). The jury found October 1, 2004, to be the date by which the operator of the Pettit Unit, in the exercise of reasonable diligence, should have discovered that Hunt Oil did not cement off the Pettit formation.

■ The parties agree that under Texas law, the discovery rule applies when "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *See Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 456. They disagree on whether Live Oak's alleged injury was "inherently undiscoverable." As the Texas Supreme Court explained in *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734–35 (Tex. 2001):

An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence. *S.V. v. R.V.,* 933 S.W.2d 1, 7 (Tex.1996) (citing *Altai,* 918 S.W.2d at 456). "Inherently undiscoverable" does not mean that a particular plaintiff did not discover his or her particular injury within the applicable limitations period. *Id.* Instead, we determine whether an injury is inherently undiscoverable on a categorical basis because such an approach "brings predictability and consistency to the jurisprudence." *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 122 (Tex.2001) (citing *S.V. v. R.V.,* 933 S.W.2d at 6); *see also HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998). Accordingly, the question here is not whether Horwood and Glass detected the alleged improper charges and resulting underpayment within the limitations period. Rather, we must decide whether theirs is "the type of injury that generally is discoverable by the exercise of reason-

able diligence." *HECI*, 982 S.W.2d at 886.

The court also explained in *Via Net, U.S. v. TIG Insurance Co.*, 211 S.W.3d 310, 314 (Tex.2006), that whether an injury is inherently undiscoverable is a legal question "decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." (Emphasis in original).

Hunt Oil argues the existence of a "leaky bucket" is the type of injury that generally is discoverable within the limitations period by the exercise of reasonable diligence. Live Oak contends discovering the injury would require "unreasonable diligence," arguing "it is unrealistic to expect Live Oak to discover that Hunt's wells were not properly cemented 5,200 feet below the surface by inspecting the property." Live Oak concludes that until it reviewed the file of the Butler wellbore in 2004, it was not reasonable for it to have discovered the injury. Until then, it alleges it had no right and no reason to seek information from Hunt Oil or any other operator in the field.

Citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex.1998), Hunt Oil argues Live Oak's injury was not "inherently undiscoverable on a categorical basis." *See Wagner & Brown*, 58 S.W.3d at 735. In *HECI*, the court stated:

> As owners of an interest in the mineral estate, the Neels had some obligation to exercise reasonable diligence in protecting their interests. This includes exercising reasonable diligence in determining whether adjoining operators have inflicted damage. Royalty owners cannot be oblivious to the existence of other operators in the area or the existence of a common reservoir. In some cases,

wells visible on neighboring properties may put royalty owners on inquiry. In any event, a royalty owner should determine whether a common reservoir underlies its lease because it knows or should know that, when there are other wells drilled in a common reservoir, there is the potential for drainage or damage to the reservoir.

*HECI*, 982 S.W.2d at 886. Live Oak distinguishes *HECI*, arguing Hunt Oil and Live Oak are not sharing a common reservoir and the wrongful conduct was not the draining of minerals by visible neighboring operators. While it is true Hunt Oil and Live Oak were not "sharing a common reservoir," it is also true that Hunt Oil had drilled the unprotected wells through the Pettit formation itself on the way to recovering oil beneath it. Here there is not an issue of "wells visible on neighboring properties" that the *HECI* court stated "may put royalty owners on inquiry," *id.*, but wells visible on the very same tract. And as the court explained in *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 619–20 (Tex. App.-Texarkana 2002, pet. denied), the obligation to exercise due diligence goes beyond mere visual observation: "in *[HECI]*, the court held the owner's obligation of due diligence went beyond mere passive visual observation, but also extended to inquiries of the lessees as to their activities."

■ Live Oak also distinguishes *HECI* on the ground that no contractual relationship existed between it and Hunt Oil,[1] concluding that Live Oak had no reason to ask for information from Hunt Oil before the sale of the Butler well, and Hunt Oil had no obligation to provide it. While *HECI* did involve a claim for breach of contract, *see also Via Net*, 211 S.W.3d at

---

1. Live Oak also contended, however, that Hunt Oil was liable to it for breach of the operating agreement entered into at the time the Pettit formation was unitized in 1958.

314 ("[d]ue diligence may include asking a contact partner for information needed to verify contractual performance"), the discovery rule's due diligence requirement is not limited to cases involving a contractual relationship. *See, e.g., Bayou Bend Towers Council of Co–Owners v. Manhattan Constr. Co.,* 866 S.W.2d 740, 742–43 (Tex. App.-Houston [14th Dist.] 1993, writ denied) (discovery rule imposes duty on plaintiff to exercise reasonable diligence to discover facts of negligence or omission); *see also Gillespie v. Fields,* 958 S.W.2d 228, 230–32 (Tex.App.-Tyler 1997, pet. denied) (applying "inherently undiscoverable" test to negligence claim to conclude discovery rule did not apply, noting plaintiff offered no evidence of due diligence).

■ We conclude that Live Oak's injury, the existence of a "leaky bucket" preventing oil production, was not "inherently undiscoverable." In its purchase of its leasehold interest in 2002, Live Oak averred it had "been provided sufficient time and access to all records, both public and on hand sufficient to inspect, examine and satisfy itself with regard to the ownership, condition, and operations of the 'subject interests'...." As a practical matter, when purchasing the property in the hope of producing oil, "reasonable diligence" would include at least a preliminary determination whether recovery of oil could be undertaken on the site, or whether previous activity or damage precluded the possibility, especially with some fifty visible wells on the surface. *See HECI,* 982 S.W.2d at 886 (owners of interest in mineral estate had some obligation to exercise reasonable diligence in protecting their interests, including determining whether adjoining operators have inflicted damage).[2]

Hunt Oil argues public records did exist showing that cement had not been used in the wells at issue at the depths relevant to producing oil from the Pettit. Hunt Oil filed applications for annular disposal of drilling fluids (known as form UIC–14) with the Louisiana Office of Conservation that included a schematic drawing of the actual well, including the location of the cement. Live Oak counters that other forms on file with the Louisiana Office of Conservation, filed after disposal of waste into the annular space (known as form ENG–16), contained a false representation under oath that Hunt Oil "has protected the Pettit as required by law." These forms, however, did not include any specific information or verification about the cementing of the well. If the information on form ENG–16 did constitute a representa-

---

**2.** In addition, Live Oak contended it planned secondary recovery on the site as well. At trial, Philip N. Asprodites, a former Commissioner of Conservation for the State of Louisiana, testified as an expert witness on Live Oak's behalf. Asprodites explained to the jury that to undertake a "secondary recovery" program to attempt to recover additional reserves "after the initial pressure is depleted in the zone or the reservoir," an operator could inject water into the reservoir to force oil out. To obtain permission to water flood a reservoir, an applicant would be required to represent to the Louisiana commission that the reservoir is a "closed system" from which the water could not escape or leak. Asprodites testified that with only one leaking well, an applicant might decide the economics justi-

fied a repair to create a closed system. But "[i]f you have many holes, thirty, forty, fifty holes, it's like a piece of Swiss cheese, it's a different matter." When asked whether Live Oak could obtain a water flood permit to recover oil from the Pettit system, Asprodites concluded, "I don't see how an expert for Live Oak could testify under oath that the Pettit formation ... is a closed system today," because of the many unprotected wells. In any event, at least some degree of "reasonable diligence" would be required in order to make this averment to the Louisiana commission. *See HECI,* 982 S.W.2d at 886. But because there is some evidence Live Oak considered secondary production only when primary production failed, this argument is not conclusive as to limitations.

tion about cementing, as Live Oak contends, then those forms would contradict other public records regarding the wells, a discrepancy Live Oak could have discovered and investigated prior to its purchase in 2002.

Further, Live Oak witness Broussard (employed by the Louisiana Office of Conservation) testified that in the 1990 to 1994 time frame, he was able to check forms known as "casing affidavits" to determine "how the well is cemented." Broussard testified he determined Hunt Oil's cementing procedures "were not adequate for the deeper wells they were drilling in the East Haynesville field." He contacted Hunt Oil about the problem, then checked the casing affidavits for the next few wells that Hunt Oil drilled to determine that the deeper wells were cemented properly. Although Broussard did not testify whether these records were publicly available, Live Oak was apparently able to identify Broussard and present his testimony regarding the casing affidavits at trial in support of its claim that Hunt Oil was negligent in failing to cement its wells.

Live Oak's president testified that operators do not routinely investigate public records of another operator "unless there's a reason to think it's affecting your property," and Live Oak argues that "unreasonable" diligence would be required "to continuously seek and obtain information on drilling practices from *every operator* in the field to ensure each operator's compliance with the regulations designed to protect formations like the Pettit." Live Oak also argues there was nothing to put it on notice that investigation was required. Similar arguments were rejected in *HECI.* The court of appeals had reasoned:

> HECI argues that the existence of its suit against AOP was inherently *discoverable.* HECI's administrative complaints against AOP were available in

the Railroad Commission's public records, the lawsuit pleadings were available in the Fayette County district clerk's office, and news of the judgment was published in the Fayette County weekly newspaper and a petroleum industry newsletter. The Neels contend that, without knowledge of AOP's misdeeds, they were not required by the due-diligence standard to scour the Railroad Commission's records; besides, those records would show only that HECI had taken action to protect the entire leasehold. Nothing in the Railroad Commission records would reveal the lawsuit against AOP, much less the need to represent their own interests in such a suit. Likewise, the Neels contend that due diligence did not require them to comb through records of the Fayette County district clerk's office looking for lawsuits that might adversely affect their interests. The Neels, who do not reside in Fayette County, do not feel due diligence required them to read every issue of the local newspaper or every industry publication.

We conclude that this type of injury is inherently undiscoverable. A lessor would not ordinarily have any reason to suspect it had been injured by its lessee's undisclosed, binding legal action. Duly diligent royalty owners are not required to stake out all government agencies in which their lessees *might* initiate proceedings that *might* affect the royalty owners' interests. Nor are royalty owners required to sift through court records in search of judgments that might benefit them. Such a requirement would impose great burdens not only on royalty owners, but on the courts, agencies, and the non-oil interests served by those entities.

*Neel v. HECI Exploration Co.,* 942 S.W.2d 212, 221–22 (Tex.App.-Austin 1997), *rev'd*

*in part,* 982 S.W.2d 881 (Tex.1998). The supreme court rejected this reasoning. Although the records on file at the Texas Railroad Commission did not provide constructive notice to the Neels, the court noted "filings and other materials publicly available from the Railroad Commission are a ready source of information, and a cause of action for failure to provide that same information is not inherently undiscoverable." *HECI,* 982 S.W.2d at 887. The court concluded, "As demonstrated in this case, the information that the Railroad Commission maintains regarding fields in which there is competing production indicates that injury to a common reservoir by an adjoining operator is not inherently undiscoverable." *Id.*

■■■■■ Robert Imel, president of Live Oak, testified that Hunt Oil and Live Oak "are the two major operators in this field," although Hunt Oil was "much larger." The Neels, the plaintiffs in *HECI,* were royalty owners who did not reside in the county where the property was located. *Neel,* 942 S.W.2d at 221. Nonetheless, their injury was not inherently undiscoverable. *HECI,* 982 S.W.2d at 887. Here,

Live Oak was the second-largest operator on the field in question and planned to undertake production on the tract. Imel testified, "we knew there was no cement across the Pettit as soon as we got the well files" from Hunt Oil, upon Live Oak's purchase of the Butler well. Live Oak did not seek these files or any other information from Hunt Oil at the time of its purchase of the leasehold in 2002. "Failing to even ask ... is not due diligence." *Via Net,* 211 S.W.3d at 314. Live Oak's obligation of due diligence "went beyond mere passive visual observation." *See Taub,* 75 S.W.3d at 619. Although "[w]e do not lightly conclude that we are in a better position than a jury to determine when a party should have discovered a cause of action," *Advent Trust Co. v. Hyder,* 12 S.W.3d 534, 541 (Tex.App.-San Antonio 1999, pet. denied)[3], we conclude Live Oak should have known of its claim against Hunt Oil in 2002, at the time it acquired its leasehold interest in the Pettit formation. Because Live Oak did not bring its suit against Hunt Oil until 2005, more than two years after its cause of action accrued, we sustain Hunt Oil's first issue.[4]

---

**3.** *Advent Trust,* relied on by Live Oak, is instructive. There the plaintiffs, working interest owners in certain oil and gas leases, sued to recover losses they incurred in prior litigation. The prior lawsuit involved "dually completed" wells, producing from formations at two different depths. *See Advent Trust,* 12 S.W.3d at 537. Although the court of appeals distinguished *HECI,* noting "it seems unrealistic to expect the [plaintiffs] to discover that wells have been dually completed simply by inspecting the property," *id.* at 539, it reversed a judgment based on a jury verdict for plaintiffs and held even if the discovery rule applied, plaintiffs should have known of their cause of action at the time they were sued in the underlying litigation. *Id.* at 541. The court noted the supreme court's "efforts to confine the application of the discovery rule," *id.,* citing *Murphy v. Campbell,* 964 S.W.2d 265, 271 (Tex.1997), for the proposition that "an action accrues, not when injury becomes

certain, but when the claimant should know of the injury." *Advent Trust,* 12 S.W.3d at 540. By the exercise of reasonable diligence, Live Oak should have known of its injury, the existence of "leaky bucket," at the time it acquired its interest in the Pettit formation.

**4.** Live Oak contends "as an alternative ground for affirmance" that its negligence claim was timely under Louisiana's "continuing tort" doctrine. The trial judge granted Hunt Oil's motion for summary judgment on this point, ruling "Live Oak has failed to establish a continuing tort." As we have noted, Texas law applies regarding limitations. *See Intevep,* 41 S.W.3d at 394; *see also Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 443 (Tex.App.-Fort Worth 1997, pet. denied) (continuing tort doctrine is exception to the statute of limitations in Texas). Under Texas law, the continuing tort doctrine does not apply to claims for damages arising from per-

CONCLUSION

 Because of our disposition of Hunt Oil's first issue, we need not address its remaining issues or Live Oak's cross-issue.[5] We reverse the trial court's judgment and render judgment that Live Oak take nothing in its suit.

manent injury to land. *See Mitchell Energy Corp.,* 958 S.W.2d at 443; *see also Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 270, 281 (Tex.2004) (permanent nuisance claim accrues when injury first occurs or is discovered; nuisance deemed permanent if sufficiently constant or regular that future impact can be reasonably evaluated). We agree with the trial judge that Live Oak has failed to establish a continuing tort delaying accrual of its cause of action for negligence.

5. Live Oak contends we may affirm the trial court's judgment on an alternative ground, that the jury's answer to Question No. 3, finding no breach of contract by Hunt Oil, was against the great weight and preponderance of the evidence. Live Oak did not raise this issue in a motion for new trial. A point in a motion for new trial is a prerequisite to asserting a complaint on appeal that a jury finding is against the overwhelming weight of the evidence. TEX.R. CIV. P. 324(b); TEX.R.APP. P. 33.1(a)(1)(B); *see Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991) ("A point in a motion for new trial is a prerequisite to complain on appeal that the evidence is factually insufficient to support a jury finding and that a jury finding is against the overwhelming weight of the evidence.").